Citation Nr: 1339304 
Decision Date: 11/29/13 Archive Date: 12/13/13

DOCKET NO. 91-51 693 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in New Orleans, Louisiana


THE ISSUES

1. Entitlement to service connection for a back disability. 

2. Entitlement to a total disability rating due to individual employability resulting from service-connected disability (TDIU) for the period prior to June 10, 2005.


REPRESENTATION

Appellant represented by: Disabled American Veterans


ATTORNEY FOR THE BOARD

M. Riley, Counsel 




INTRODUCTION

The Veteran served on active duty from September 1967 to October 1969. He also had multiple periods of active duty for training (ACDUTRA), including from July 11 to 23, 1976; July 16 to 30, 1977; January 11 to February 10, 1985; and June 16 to July 2, 1994. His decorations include the Combat Action Ribbon and the Purple Heart Medal with one Oak Leaf Cluster.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from May 2002 and August 2007 rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in New Orleans, Louisiana.

The Veteran's claim for TDIU was denied in the May 2002 rating decision. The issue was remanded by the Board to the agency of original jurisdiction (AOJ) for additional development in February 2006, April 2007, November 2008, March 2010, December 2010, and November 2011. The issue has now returned to the Board for further appellate action.

By the August 2007 rating decision, the RO denied a petition to reopen a previously denied claim of service connection for a back disability (characterized as "back injury; spina bifida occulta"). The Board granted the petition to reopen the claim in the December 2010 Board decision and remanded the reopened claim for additional development. The claim returned to the Board and was denied in a November 2011 decision. The Veteran appealed this denial to the Court of Appeals for Veterans Claims (Court). In April 2013, the Court granted a unilateral motion for partial remand filed by the Secretary which requested that the portion of the November 2011 decision that denied service connection for a back disability be vacated and remanded. The appeal has now returned to the Board.

Additionally, as noted in the December 2010 and November 2011 Board decisions, in a March 2009 statement, the Veteran requested reexamination in light of the new rating criteria for traumatic brain injuries (TBIs). Effective October 23, 2008, VA amended the rating criteria for evaluating TBIs. See 73 Fed. Reg. 54693 -708 (Sept. 23, 2008) (codified at 38 C.F.R. § 4.124a , Diagnostic Code 8045 (2013) for residuals of TBI). Veterans who have been rated by VA under the prior version of Diagnostic Code 8045 are permitted to request review of under the revised criteria irrespective of whether the disability has worsened since the last review or whether VA has received additional evidence. See 73 Fed. Reg. at 54693. The Veteran is service connected for a shrapnel fragment wound to the left side of the head and migraine headaches. As the claims file does not indicate that the AOJ has addressed the Veteran's claim pertaining to TBI from the time of the December 2010 Board remand, the Board does not have jurisdiction over it and it is again referred to the AOJ for appropriate action. 


FINDINGS OF FACT

1. The preponderance of the evidence is against finding that the Veteran has a low back disability that is etiologically related to a disease, injury, or event in service.

2. For the period prior to July 10, 2005, the Veteran's service-connected disabilities did not preclude him from securing or following substantially gainful employment consistent with his education and industrial background. 


CONCLUSIONS OF LAW

1. A low back disability was not incurred in or aggravated by service, and may not be presumed to have been so incurred. 38 U.S.C.A. §§ 1101, 1110, 1131, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304, 3.307, 3.309 (2013).

2. The criteria for entitlement to a TDIU for the period prior to July 10, 2005 are not met. 38 U.S.C.A. § 1155; 38 C.F.R. §§ 3.340, 3.341, 4.16, 4.25.





REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

As a preliminary matter, the Board notes that it has thoroughly reviewed all the evidence in the Veteran's claims file. Although the Board has an obligation to provide reasons and bases supporting this decision, there is no need to discuss, in detail, all the evidence submitted by or on behalf of the Veteran. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) (the Board must review the entire record, but does not have to discuss each piece of evidence). The analysis below focuses on the most salient and relevant evidence and on what this evidence shows, or fails to show, on the claims. The Veteran must not assume that the Board has overlooked pieces of evidence that are not explicitly discussed herein. See Timberlake v. Gober, 14 Vet. App. 122 (2000) (the law requires only that the Board address its reasons for rejecting evidence favorable to the Veteran).


Service Connection Claim

The Veteran contends that service connection is warranted for a back disability as it was incurred due to an injury that occurred during a period of ACDUTRA. Service connection may be granted for a disability resulting from a disease or injury incurred in or aggravated by active service. See 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303(a). To establish a right to compensation for a present disability, a Veteran must show: (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service"-the so-called "nexus" requirement. Holton v. Shinseki, 557 F.3d 1362, 1366 (Fed. Cir. 2010) (quoting Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004). See also Davidson v. Shinseki, 581 F.3d 1313 (Fed.Cir.2009); Jandreau v. Nicholson, 492 F.3d 1372 (Fed.Cir.2007). 

Active military, naval, or air service includes any period of ACDUTRA during which the individual concerned was disabled from a disease or injury incurred in line of duty. 38 U.S.C.A. § 101(21) and (24); 38 C.F.R. § 3.6(a). Active military, naval, or air service also includes any period of inactive duty training (INACDUTRA) duty in which the individual concerned was disabled from injury incurred in the line of duty. Id. Accordingly, service connection may be granted for disability resulting from disease or injury incurred in, or aggravated, while performing ACDUTRA or from injury incurred or aggravated while performing INACDUTRA. 38 U.S.C.A. §§ 101(24), 106, 1131. ACDUTRA includes full time duty performed by members of the National Guard of any state or the reservists. 38 C.F.R. § 3.6(c). INACDUTRA includes duty other than full time duty performed by a member of the Reserves or the National Guard of any state. 38 C.F.R. § 3.6(d). 

When a chronic disease is shown in service sufficient to permit a finding of service connection, subsequent manifestations of the same chronic disease at any later date are service connected, unless clearly attributable to intercurrent causes. 38 C.F.R. § 3.303(b). For the showing of chronic disease in service there is required a combination of manifestations sufficient to identify the disease entity, and sufficient observation to establish chronicity at the time. Id. When the disease identity is established (leprosy, tuberculosis, multiple sclerosis, etc.), there is no requirement of evidentiary showing of continuity. Id. For this purpose, a chronic disease is one listed at 38 C.F.R. § 3.309(a). See Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013)(holding that the term "chronic disease in 38 C.F.R. § 3.303(b) is limited to a chronic disease listed at 38 C.F.R. § 3.309(a)). 

As a preliminary matter, the Board notes that the analysis below is limited to whether service connection for the claimed back disability is warranted as directly due to service. Although certain evidentiary presumptions are provided by law to assist veterans in establishing service connection for a disability, these presumptions do not apply to the current claim. Specifically, the presumption pertaining to chronic diseases (such as arthritis) that manifest to a compensable degree within one year of discharge from active service are not applicable to ACDUTRA or INACDUTRA service. See 38 C.F.R. §§ 3.307 and 3.309; Smith v. Shinseki, 24 Vet. App. 40, 45 (2010); see also Acciola v. Peake, 22 Vet. App. 320 (2008). Additionally, as the claims file does not contain a physical examination report at the onset of the Veteran's ACDUTRA period when he claims to have incurred a low back injury, the presumption of soundness and presumption of aggravation do not apply to the current claim. Smith, supra.

The Veteran contends that he injured his back during a period of ACDUTRA dating from July 16 to July 30, 1977. He asserts that during this period he fell off a truck and landed on a toolbox, injuring his back. He has reported ongoing back problems since that time. An April 1977 letter from the Louisiana Army National Guard ordered the Veteran to ACDUTRA for the period July 16, 1977, to July 30, 1977. A Statement of Medical Examination and Duty Status, dated July 27, 1977, documents that the Veteran injured his back on July 18, 1977 in the line of duty. The Veteran was performing maintenance on a truck in the field when he slipped off the truck and wrenched his back. He was subsequently treated for trauma to the low back and for low back pain. X-rays of the lumbar spine were normal except for spina bifida occulta involving the S-1 segment. He was admitted to the USAF Hospital at England AFB and diagnosed with myositis. The Veteran was discharged on July 28, 1977 to limited duty with no running, bending, or prolonged standing.

After his ACDUTRA service, the Veteran was seen by a private treatment provider for a spinal X-ray examination and a specific chiropractic spinal adjustment in August 1977. The diagnosis was right sacro-iliac strain. Subsequently, the Veteran sought treatment at the VA Hospital in Shreveport in December 1977 with a complaint of low back pain secondary to a fall six months earlier. He continued to receive treatment at the Shreveport and Overton-Brooks VAMCs in 1978 and was diagnosed with recurrent low back strain and mechanical low back pain. In February 1978, the Veteran was also treated for low back pain since a fall one and a half years earlier. The impression at that time was low back syndrome.

Additional evidence shows that the Veteran was seen in May 1979 by a private physician for low backache. There was questionable lumbar disc with sciatica. In a November 1979 letter, the physician commented that the Veteran had low backache and numbness in the lumbar spine. X-rays showed a partial spina bifida occulta involving the S1 segment. The diagnosis was low back pain, probably postural with partial spina bifida occulta of S-1. The physician noted that another doctor in Orthopedics thought that there was no orthopedic cause for the Veteran's low back pain.

Almost 20 years later, during treatment for obesity in January 1998, the Veteran reported a history of back problems. In August 2000, a lumbar MRI at the Shreveport VAMC indicated a disc protrusion at L5-S1. An August 2000 note from the urology clinic noted that the MRI showed significant lesions of the lumbar spine. A January 2001 Social Security Administration (SSA) disability examination also noted a history of chronic low back pain. A May 2001 neurology study noted the Veteran's August 2000 MRI findings, but did not attribute any neurological complaints to the Veteran's back disability. In March 2002, the Veteran underwent a general VA examination to address multiple disabilities. Although no diagnosis was made concerning the back, it was noted that the Veteran had some complaints concerning joints in the low back.

A January 2005 MRI of the lumbar spine showed degenerative disc disease at L4-L5, to include borderline spinal stenosis. A VA X-ray was taken of the Veteran's thoracic spine in July 2005. The impression was mild degenerative changes and mild scoliosis. In March 2006, the Veteran underwent another general VA examination. Among the listed diagnoses was degenerative disc disease of the lumbar spine with spinal stenosis at L4-L5 and L5-S1. At that examination, a history of an injury during "summer camp" in the 1980s was reported by the Veteran. He stated that he fell off of a "deuce-and-a-half" and landed on his back on top of a toolbox. Subsequent VA medical records show treatment for chronic low back pain. A VA MRI taken in May 2006 revealed spondylosis of the lumbar spine.

A January 2007 discharge summary from Presbyterian Hospital showed a diagnosis of spinal stenosis and that the Veteran underwent a L4-L5 and L5-S1 posterior decompression and L4-L5 facet replacement with TFAS device. In April 2007, a VA X-ray of the lumbar spine showed sclerotic facet degenerative changes and fusion of the lumbar spine. Since that time, the Veteran has sought intermittent treatment for low back problems and consistently noted a previous history of back symptoms. 
Pursuant to the Board's December 2010 remand instructions, the Veteran was afforded a VA examination in January 2011. The examiner reviewed the claims file and the Veteran's reports that he injured his back when he fell from a vehicle onto a tool box. The Veteran indicated that the injury was to the L5-S1 disc and that he was offered surgery, but declined. He also stated that he continued working until 1995 and was intermittently treated for his back symptoms, but never required hospitalization. The Veteran stated that he retired from the Army National Guard in 1995 because he could not perform his regular duties without restriction due to spondylosis, lumbar spondylolisthesis, and degenerative disc disease. The Veteran claimed to have developed numbness in the lower extremities in 2005, was confined to a wheelchair in 2006, and underwent L4-L5 and L5-S1 posterior decompression and L4-L5 facet replacement with TFAS device. Immediately thereafter the lower extremity numbness improved, but regressed about 2 years after the surgery. Near contemporaneous X-rays from November 2010 showed internal fixation with no apparent change at L4-L5, but progressive narrowing of L2-L3 and L3-L4 and posterior subluxation at L3-L4. A May 2010 MRI showed progression of collapsed disc space at L3-L4 with underlying moderate degree of central spinal canal stenosis and posterior fusion with spinal instrumentation at L4-L5 that appeared stable. The examiner diagnosed lumbar spondylosis with degenerative disc disease and radiculitis, post laminectomy. 

The VA examination report also included a discussion of the private treatment records in the claims file, including the January 2001 SSA examination (which did not list lumbar spine disease as a diagnosed condition), the January 2007 Presbyterian Hospital surgery notes, and the various radiological tests performed throughout the claims period. Based on the foregoing, the examiner concluded that it was less likely as not that the Veteran's lumbar spondylosis with degenerative disc disease and radiculitis, post laminectomy, was caused by or a result of his in-service back injury. The rationale for the opinion was that while the service treatment records showed occasional back complaints, the conditions were treated and were transitory. From 2000, however, radiographic studies showed progressive degenerative disc disease involving not only the lumbar spine, but also the thoracic and cervical areas of the spine. This degeneration did not appear to be traumatic in nature, as it was not limited to the "injured" lumbar spine, but was throughout the whole spine. As such, the examiner concluded that the current back symptomatology was related to spondylosis, degenerative disc disease, and post-operative surgical changes. Moreover, the examiner opined that the degenerative changes were the normal result of the aging process, rather than a back injury or aggravation; aging was the primary cause of the Veteran's spondylosis and arthritis. The examiner cited to multiple sources in support of the proposition that the changes of the spine were most likely the result of the normal aging process.

Thus, the evidence of record reflects that the Veteran has a current diagnosis of lumbar spondylosis with degenerative disc disease and radiculitis, post laminectomy. Having reviewed the complete record, however, the Board concludes that the preponderance of the evidence is against a finding that the Veteran's current low back disability was incurred in or aggravated by his military service. 

The Board finds the January 2011 VA medical opinion is the most credible, competent, and probative evidence addressing the etiology of the claimed disability. The reviewer considered the Veteran's claims file, his contentions, the medical evidence of record, and conducted a complete physical examination. Based on the evidence reviewed, the VA examiner provided an opinion that the Veteran's low back disabilities were not caused by or a result of his military service, to include the 1977 injury. Further, a complete and thorough rationale is provided for the opinion rendered. The examiner's conclusion is fully explained and consistent with the credible evidence of record. The examiner clearly stated that the most likely cause of the Veteran's current low back disability was due to the normal aging process, as evidenced by the temporary nature of his complaints at the time of service and the lack of diagnostic evidence showing degenerative changes of the spine until 2000, more than 20 years after the 1977 in-service injury. The examiner also cited multiple sources in support of the conclusion that the normal aging process was the most likely cause of the Veteran's current lumbar spine disability. As such, medical opinion of the January 2011 VA examiner is entitled to substantial probative weight. See Nieves- Rodriguez v. Peake, 22 Vet. App. 295 (2008) (the probative value of a medical opinion comes from when it is the factually accurate, fully articulated, and sound reasoning for the conclusion, not the mere fact that the claims file was reviewed).
The Board has considered the Veteran's assertions that his current low back disability was caused by his 1977 fall during ACDUTRA. Certainly, the Veteran can attest to factual matters of which he has first-hand knowledge, such as subjective complaints of low back pain, and his testimony in that regard is entitled to some probative weight. See Washington v. Nicholson, 19 Vet. App. 362, 368 (2005). He is not, however, necessarily competent to render an opinion as to the cause or etiology of his subsequently diagnosed low back disability because he does not have the requisite medical knowledge or training. See Jandreau v. Nicholson, 492 F.3d 1372, 1376-1377 (Fed. Cir. 2007); Buchanan v. Nicholson, 451 F.3d 1131, 1336 (Fed. Cir. 2006).

The Board finds the Veteran's assertions particularly problematic in light of the contemporaneous X-rays that failed to show any evidence of trauma to the lumbar spine and no abnormalities other than spina bifida occulta at S1, discussed in more detail below. Moreover, additional X-ray evidence in May 1979 again showed no evidence of trauma to the lumbar spine. The first diagnostic evidence of a chronic lumbar disability was more than 20 years after service. Thus, the Board ultimately places far more probative weight on the opinions of the January 2011 VA examiner, who considered the Veteran's lay report, but based on a complete review of the claims file and medical records concluded that the Veteran's low back disability was not caused by a 1977 fall, but most likely was the result of the normal aging process. See Jandreau, supra (explaining in footnote 4 that a veteran is competent to provide a diagnosis of a simple condition such as a broken leg, but not competent to provide evidence as to more complex medical questions).

Finally, the Board has considered the July 1977 and May 1979 X-rays showing spina bifida occulta at S1, as well as the August 1977 record diagnosing right sacro-iliac strain. The Board notes that congenital or developmental defects, including spina bifida occulta, are not diseases or injuries within the meaning of the applicable legislation. 38 C.F.R. §§ 3.303(c), 4.9 (2013). Such conditions are part of a life-long defect and are normally static conditions which are incapable of improvement or deterioration. See VAOGCPREC 67-90 (1990). VA regulations specifically prohibit service connection for a congenital or developmental defect - unless such defect was subjected to a superimposed disease or injury which created additional disability. See VAOPGCPREC 82-90 (July 18, 1990) (cited at 55 Fed. Reg. 45,711) (Oct. 30, 1990) (service connection may not be granted for defects of congenital, developmental or familial origin, unless the defect was subject to a superimposed disease or injury); see also Carpenter v. Brown , 8 Vet. App. 240, 245 (1995). 

In this case, there is no lay or medical evidence indicating that the Veteran's preexisting congenital spina bifida occulta was subject to a superimposed injury as a result of the Veteran's 1977 fall. Indeed, the May 1979 private treatment provider specifically noted X-ray evidence of spina bifida occulta at S1, yet concluded that the Veteran's low back pain was most likely due to postural problems, rather than orthopedic abnormality or congenital defect. No medical provider has opined to the contrary, nor has the Veteran or other lay person raised such a claim. While the Veteran had a right sacro-iliac strain August 1977, this clearly was an acute problem as it was never noted again by any of the Veteran's treatment providers. As such, there is no evidence to suggest an injury superimposed on the Veteran's preexisting spina bifida occulta and service connection is not possible for this disability.

In summary, the Board concludes that the weight of the competent evidence of record indicates that the most likely cause of the Veteran's current low back disability is the normal aging process. As noted above, no medical professional has attributed the Veteran's current low back disabilities to his military service or in-service fall; in fact, the only competent medical opinion of record weighs against such a link. While the Veteran has reported continuous symptoms of back pain since service, the Board finds that the contemporaneous and post-service medical evidence showing no evidence of lumbar spine trauma or degenerative changes and the January 2011 VA examiner's clear and thorough medical opinion substantially outweigh the Veteran's contentions. As such, the Board concludes that the preponderance of the evidence is against the Veteran's claim for service connection, and the benefit-of-the-doubt rule does not apply. See 38 U.S.C.A. § 5107(b); Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 


Claim for TDIU Prior to June 10, 2005

The Veteran contends that he has been unable to work due to service-connected disabilities since May 1995. In its November 2008 remand, the Board determined that the claim for TDIU for the period beginning June 10, 2005 was rendered moot by the award of a 100 percent disability rating for service-connected posttraumatic stress disorder (PTSD) and the assignment of increased ratings for service-connected chronic photodermatitis and exercise-induced asthma. Thus, the claim currently before the Board is limited to consideration of whether TDIU is warranted for the period prior to June 10, 2005. 

VA will grant a TDIU when the evidence shows that the Veteran is precluded, by reason of his service-connected disabilities, from obtaining or maintaining "substantially gainful employment" consistent with his education and occupational experience. 38 C.F.R. §§ 3.340, 3.341, 4.16 (2013); VAOPGCPREC 75-91; 57 Fed. Reg. 2317 (1992).

During the period prior to June 10, 2005, the Veteran met the schedular criteria for an award of TDIU. From October 26, 2000, he was service-connected for migraine headaches rated as 50 percent disabling, chronic photodermatitis rated as 30 percent disabling, exercise-induced asthma rated as 30 percent disabling, diabetes mellitus with noncritical coronary artery disease (CAD) rated as 20 percent disabling, and other disabilities resulting in a combined evaluation for compensation was 90 percent. The Veteran also met the criteria for TDIU from February 16, 1999, when his combined evaluation for compensation was 70 percent. Therefore, the Veteran satisfies the percentage criteria for a TDIU during the period beginning February 16, 1999 under 38 C.F.R. § 4.16(a), as he had two or more service-connected disabilities with one rated at least 40 percent disabling and a combined rating of at least 70 percent disabling. 38 C.F.R. § 4.16(a) (2013). 

The central inquiry in a claim for TDIU is, "whether the veteran's service-connected disabilities alone are of sufficient severity to produce unemployability." Hatlestad v. Brown, 5 Vet. App. 524, 529 (1993). In this case, the record does not establish that the Veteran was not able to maintain gainful employment due solely to service-connected disabilities at any time prior to June 10, 2005. Therefore, an award of TDIU is not warranted and the case will not be referred to the Director for consideration of TDIU for the period prior to June 10, 2005.

On his formal claim for TDIU in February 2002, the Veteran reported that he last worked in May 1995 in heavy mobile equipment repair for the Louisiana Army National Guard. He also indicated that he stopped working due to his service-connected diabetes mellitus and TBI (presumably a reference to service-connected migraine headaches). With regard to his education, the Veteran reported that he graduated high school, but had no other education or training. Upon VA examination in March 2006, the Veteran stated that he had attended diesel mechanic school prior to beginning his work with the National Guard, and had completed two semesters of college while working as a mechanic. 

After review of the evidence of record, the Board finds that the Veteran was not unemployable due to service-connected disabilities prior to June 10, 2005. The Veteran was provided a VA general medical examination in March 2002, and the examining provider concluded that the Veteran's service-connected and nonservice-connected disabilities did not individually or as whole preclude him from maintaining employment. Additionally, VA examiners who reviewed the complete claims file in July 2010 and January 2012 both provided medical opinions against the claim for TDIU. The July 2010 VA examiner provided opinions addressing each of the Veteran's service-connected disabilities, finding that none of them rendered the Veteran unemployable for heavy duty or sedentary work and did not prevent his usual occupation as a diesel mechanic prior to June 10, 2005. The January 2012 VA examiner also opined that the Veteran's service-connected disabilities did not cumulatively preclude employment consistent with his education and occupational experience prior to June 10, 2005. These opinions were rendered after complete review of the record and were accompanied by well-reasoned rationales based on the symptoms and treatment manifested by the service-connected disabilities during the applicable period. The July 2010 and January 2012 VA opinions are therefore entitled to substantial probative weight. See Nieves- Rodriguez, supra.

Although the record contains some medical evidence indicating that the Veteran was unemployable during the period prior to June 10, 2005, this evidence does not establish that the Veteran was unemployable due solely to service-connected disabilities. Nonservice-connected disabilities may not be considered in the determination of whether the Veteran warrants TDIU. 38 C.F.R. §§ 3.341, 4.19; Van Hoose v. Brown, 4 Vet. App. 361, 363 (1993). The Veteran's private physician opined in March 1996, April 1997, and January 2001 that the Veteran was completely disabled for gainful employment. However, further review of the private doctor's statements and findings show that the Veteran's primary disability during this period was the loss of use of his right hand due to crushing injuries incurred at work in 1990 and 1992. In a January 2001 disability report, the private physician found that the Veteran had lost more than 70 percent of function of the right hand with complete functional loss of the second finger of the right hand. Thus, the private medical evidence does not establish that the Veteran was unemployable due to service-connected disabilities prior to June 10, 2005.

The Veteran contends that an award of TDIU is warranted as he was granted disability compensation from the SSA in 2001. In a May 2001 decision, the SSA found that the Veteran was disabled and unable to work since October 1998. The findings of the SSA are not controlling in the adjudication of claims for VA benefits. Murincsac v. Derwinski, 2 Vet. App. 363, 370 (1992). Although the SSA concluded that the Veteran was entitled to benefits based on the impact of his disabilities on employment, the Board uses different criteria and regulations for determining whether a veteran is unemployable. Furthermore, the grant of SSA compensation in 2001 was based on consideration of all the Veteran's service-connected disabilities, including his nonservice-connected right hand injury and gastroesophageal reflux disease (GERD). In fact, the May 2001 SSA decision states that the Veteran's "primary impairment is related to injuries to his right (dominant) hand sustained on-the-job in 1990 and 1992." It is therefore clear that the award of SSA compensation in 2001 does not establish that the Veteran was unemployable due to service-connected disabilities prior to June 10, 2005. 

The Board has also considered the Veteran's statements that he was unable to work due to service-connected disabilities prior to June 10, 2005. While the Veteran is competent to report observable symptoms associated with his disabilities, his statements are outweighed by the medical evidence against the claim, including the opinions of the July 2010 and January 2012 VA examiners. The rationale cited by the VA examiners in support of their medical opinions references the symptoms reported by the Veteran during contemporaneous treatment for service-connected disabilities and their conclusions that his disabilities were well-controlled before June 10, 2005. The Board therefore finds that the preponderance of the evidence is against a finding that the Veteran was unemployable due solely to service-connected disabilities prior to June 10, 2005. Accordingly, the benefit-of-the-doubt rule is inapplicable and the claim must be denied. 38 U.S.C.A. § 5107(b) (West 2002); Gilbert, supra; 38 C.F.R. §§ 4.15, 4.16, 3.340, 3.341.


Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA), Pub. L. No. 106-475, 114 Stat. 2096 (Nov. 9, 2000) (codified at 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107, 5126 (West 2002)) defined VA's duties to notify and assist a veteran in the substantiation of a claim. VA regulations for the implementation of the VCAA were codified as amended at 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2013).

VA must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; (3) and that the claimant is expected to provide. Pelegrini v. Principi (Pelegrini II), 18 Vet. App. 112, 120-21 (2004), see 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b).

In this case, notice fulfilling the requirements of 38 C.F.R. § 3.159(b) was furnished to the Veteran in February 2007, January 2009, and January 2011 letters. The Veteran also received notice regarding the disability-rating and effective-date elements of the claims in the January 2009 and January 2011 letters. See Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). 

Furthermore, even if any notice deficiency is present in this case, the Board finds that any prejudice due to such error has been overcome in this case by the following: (1) based on the communications sent to the Veteran over the course of this appeal, the Veteran clearly has actual knowledge of the evidence the Veteran is required to submit in this case; and (2) based on the Veteran's contentions as well as the communications provided to the Veteran by VA, it is reasonable to expect that the Veteran understands what was needed to prevail. See Shinseki v. Sanders/Simmons, 129 S. Ct. 1696 (2009); Fenstermacher v. Phila. Nat'l Bank, 493 F.2d 333, 337 (3d Cir. 1974) ("[N]o error can be predicated on insufficiency of notice since its purpose had been served."). In order for the Court to be persuaded that no prejudice resulted from a notice error, "the record must demonstrate that, despite the error, the adjudication was nevertheless essentially fair." Dunlap v. Nicholson, 21 Vet. App. 112, 118 (2007).

In this case, the Veteran has been continuously represented by an experienced Veteran Service Organization and has submitted argument in support of his claims. These arguments have referenced the applicable law and regulations necessary for a grant of service connection and grant of TDIU. Thus, the Board finds that the Veteran has actual knowledge as to the information and evidence necessary for him to prevail on his claims and is not prejudiced by a decision in this case. As such, a remand for additional notice would serve no useful purpose and would in no way benefit the Veteran. Sabonis v. Brown, 6 Vet. App. 426, 430 (1994) (remands which would only result in unnecessarily imposing additional burdens on the VA with no benefit flowing to the Veteran are to be avoided).

VA is also required to make reasonable efforts to help a claimant obtain evidence necessary to substantiate a claim. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159(c), (d). This "duty to assist" contemplates that VA will help a claimant obtain records relevant to a claim, whether or not the records are in Federal custody, and that VA will provide a medical examination or obtain an opinion when necessary to make a decision on the claim. 38 C.F.R. § 3.159(c)(4).

The Board finds that VA's duty to assist has been satisfied. The Veteran's service treatment records and VA medical records are in the file. In addition, records from the SSA have been associated with the claims file. The Board notes that records from several private treatment providers have been associated with the claims file, to the extent available. 

As noted above, the Board denied the claim for entitlement to service connection for a back disability in a November 2011 decision. The Veteran appealed the denial of the claim to the Court, and the Board's decision was partially vacated and remanded in April 2013 at the request of the Secretary. The vacatur and remand were predicated on a finding that the Board's November 2011 decision provided an inadequate statement of reasons of bases for its determination that the duty to assist had been satisfied with respect to records obtained by VA. Specifically, the Secretary found that the Board did not obtain and consider records from the Overton-Brooks VAMC dating from 1978 in connection with the claim for service connection for a back condition. The records were retrieved from federal storage by the counsel for the Secretary as part of an on-going Record Before the Agency (RBA) dispute resolution and were constructively of record at the time of the November 2011 Board decision. In addition, the Board did not clarify whether the Veteran's hospital records from England AFB for the period from July 25, 1977 to July 28, 1977 were obtained and included in the claims file at the time of the November 2011 decision. 

Review of the complete claims file establishes that the records from the Overton-Brooks VAMC referenced in the April 2013 motion for partial remand are currently part of the record before the Board. The Veteran sought treatment at the VAMC in December 1977 and reported injuring his back in a fall six months earlier. He was diagnosed with mechanical low back pain and treated with medication. The VAMC records also indicate that the Veteran returned in February, April, and May 1978 and was treated for low back syndrome and a low back strain. A May 1978 X-ray report is also included in the claims file. These VAMC records are included in the Veteran's claims file and were reviewed and considered by the Board prior to rendering the decision above.

Similarly, the claims file also contains the Veteran's records of hospitalization from England AFB dating from July 25, 1977 to July 28, 1978. The records show that the Veteran was admitted to the USAF Hospital at England AFB for treatment of a low back injury incurred while performing maintenance on a truck in the field during a period of ACDUTRA. He was discharged on July 28, 1977 with a diagnosis of myositis of the low back and placed on limited duty. A lumbar X-ray performed on July 25, 1977 showed a normal lumbar spine aside from spina bifida occulta of the S-1 segment. The records of the Veteran's hospitalization, including the July 1977 radiology report, are of record and were considered by the Board in its current decision.

Thus, a remand is not necessary in this case to obtain records of treatment from the Overton-Brooks VAMC or England AFB. These records are included in the claims file and were considered by the Board. 

The duty to assist also includes providing a medical examination or obtaining a medical opinion when such is necessary to make a decision on the claim, as defined by law. See 38 C.F.R. § 3.159(c)(4). In this case, the Veteran was afforded a VA examination in January 2011 to determine the nature and etiology of the claimed back disability. The examiner concluded that it was less likely than not that the Veteran's current low back disability was related to his military service. In reaching that decision, the examiner considered the Veteran's reported history, his current symptoms, review of the available private and VA treatment records, and a physical examination. The examiner provided a sufficient rationale for the opinions expressed. Based on the foregoing, the Board finds the January 2011 VA examination report is thorough, complete, and sufficient. See Barr v. Nicholson, 21 Vet. App. 303, 312 (2007) (when VA undertakes to provide a VA examination or obtain a VA opinion, it must ensure that the examination or opinion is adequate). 

The Board also finds that VA has complied with the remand orders of the Board. In response to the Board's remands, VA obtained records from the SSA pertaining to the Veteran's award of compensation and records of available VA and private treatment. The Veteran was also provided complete notice of VA's duties to notify and assist him in developing evidence to substantiate his claims. Additionally, the Veteran was provided a VA examination of his spine in January 2011 and VA examinations of his service-connected disabilities in January 2012. The claims file was reviewed by the January 2012 VA examiner who provided an opinion regarding the effect of the Veteran's service-connected disabilities on his ability to work prior to June 10, 2005. The January 2012 VA examiner opined that the cumulative effect of the Veteran's service-connected conditions did not result in occupational impairment sufficient to preclude employment consistent with the Veteran's educational and occupational experience. Although the January 2012 examiner cited the rationale used by a previous VA examiner in July 2010, the Board finds that the medical opinion is adequate and responsive to the Board's remand order. The July 2010 VA examiner described each service-connected disability and stated why it did not result in unemployability; the January 2012 examiner expressed total agreement with the opinions and information provided by the previous examiner. The July 2010 VA examiner supported her conclusions by noting that the Veteran's service-connected disabilities were either asymptomatic or well-controlled with medication and other treatment during the period prior to June 10, 2005. While the January 2012 VA examiner repeated the findings of the July 2010 examiner, the facts and evidence referenced by both examiners have not changed as the claim for TDIU is only concerned with the period prior to June 10, 2005. Finally, the January 2012 VA examiner provided the specific opinion requested by the Board, i.e. whether the cumulative effect of the Veteran's service-connected disabilities resulted in unemployability. A full rationale, while the same as that used by the July 2010 VA examiner, was provided and the Board therefore finds that the VA has complied with the remand orders of the Board. 

For the reasons set forth above, the Board finds that VA has complied with the VCAA's notification and assistance requirements. 










ORDER

Entitlement to service connection for a back disability is denied. 

Entitlement to TDIU for the period prior to June 10, 2005 is denied.



______________________________________________
ROBERT E. SULLIVAN
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs